UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.

RICHARD BUDZYNA, and WILLIAM J. CURTIS,
III, Individually and on Behalf of All Other Persons
Similarly Situated

Plaintiff,

v.

PAULA CAREY, in her capacity as CHIEF
JUSTICE OF ADMINISTRATION AND
MANAGEMENT; JOHN BELLO, in his capacity as
COURT ADMINISTRATOR OF THE
MASSACHUSETTS TRIAL COURTS; CHARLES
O'BRIEN, in his capacity as DIRECTOR OF
FACILITIES MANAGEMENT AND CAPITAL
PLANNING DEPARTMENT OF THE TRIAL
COURT; and CAROL GLADSTONE, in her
capacity as COMMISSIONER OF the DIVISION
OF CAPITAL ASSET MANAGEMENT

Defendants

## VERIFIED COMPLAINT

## JURY TRIAL DEMANDED

Plaintiffs, Richard Budzyna and William Curtis ("Plaintiffs"), by their attorneys, alleges

the following on behalf of themselves and all others similarly situated ("the Class"), on information

and belief based, *inter alia*, upon the investigation of her counsel, except as to those allegations

which pertain to the Plaintiffs or her attorneys, which are alleged on personal information and

belief.  Named as Defendants are Paula Carey, in her capacity as Chief Justice of Administration

and Management; John Bello, in his capacity as Court Administrator of the Massachusetts Trial

Courts; Charles O'Brien, in his capacity as Director of Facilities Management and Capital

Planning Department of the Trial Court; and Carol Gladstone, in her capacity as Commissioner of the Division of Capital Asset Management (collectively "Defendants").

## NATURE OF THE ACTION

1. This is a class action brought by the Representative Plaintiffs, individually and on behalf of all other similarly situated individual by and through their counsel, Alekman DiTusa, LLC, Connor & Morneau, LLP, and the Law Offices of Thomas A. Kenefick, III.

2. This Complaint seeks declaratory judgment and equitable relief, with a request for temporary restraining order, preliminary and permanent injunctive relief, and other equitable relief. Plaintiffs also seek relief under 42 U.S.C. §1983 for Defendants' violation of the 14th Amendment to the Constitution.

3. This action arises out of a longstanding controversy over the safety of the Roderick L. Ireland Courthouse in Hampden County, one of the busiest courthouses in the Commonwealth. These controversies were previously attempted to be resolved without litigation, but recent environmental concerns and conduct by Defendants has forced Plaintiffs to resort to Court intervention.

4. There is a public health and safety emergency at the Roderick L. Ireland Courthouse, located 50 State Street, Springfield, Massachusetts, that has rendered the courthouse constitutionally inadequate, thus requiring this Court to order the immediate closure of the Courthouse and emergency relocation[1] to another acceptable location in Hampden County.

---

[1] Although termination of operations at a Courthouse is uncommon, it is not unheard of. "On March 5, 1992, the Justices of the Supreme Judicial Court ordered the termination of operations at the facility housing the Chelsea Division of the District Court Department." See Smith v. Commonwealth, 420 Mass. 291, 293 n.3 (1995).

## PARTIES

5.     Plaintiff, Richard Budzyna is an individual who lives in Hampden County and works in Roderick L Ireland Courthouse.  He brings this action individually and on behalf of employees who work in the Roderick L Ireland Courthouse and members of the public who use the Roderick L Ireland Courthouse, which has a principal place of business at 50 State Street, Springfield, Hampden County, Commonwealth of Massachusetts, to exercise statutorily and constitutional rights to which they are guaranteed.

6.     Plaintiff, William Curtis is an individual who lives in Hampden County and works in Roderick L Ireland Courthouse.  He brings this action individually and on behalf of employees who work in the Roderick L Ireland Courthouse and members of the public who use the Roderick L Ireland Courthouse, which has a principal place of business at 50 State Street, Springfield, Hampden County, Commonwealth of Massachusetts, to exercise statutorily and constitutional rights to which they are guaranteed.

7.     Defendant, Paula Carey, is named as a party in her capacity as the Chief Justice for Administration and Management ("CJAM"), Administrative Office of the Trial Court, with a principal place of business located at 2 Center Plaza, Suite 540, Boston, Suffolk County, Massachusetts.

8.     Pursuant to G.L. c. 211B, §9, the CJAM has "the responsibility to provide facilities management, including provisions of maintenance, equipment and security, the responsibility to coordinate with the division of capital asset management and maintenance regarding construction, leasing, repair and designing of facilities…"

9.     Defendant, John Bello, is the Court Administrator of the Massachusetts Trial Court. The Court Administrator is "responsible for the administrative actions that support the Trial Court

mission – Justice with Dignity and Speed." His responsibilities include budget preparation and oversight, labor relations and human resources, information technology, facilities management, capital projects, and security.

10.    Defendant, Charles O'Brien, is the Director of the Facilities Management and Capital Planning Department of the Trial Court. The Facilities Management and Capital Planning Department is committed to maintaining a safe and dignified environment for court operations, and is required to do so in a way that adopts best practices and inspires public confidence.

11.    Defendant, Carol Gladstone, is the Commissioner of the Division of Capital Asset Management and Maintenance ("DCAMM"). DCAMM is responsible for capital planning, public building construction, facilities management, and real estate services for the Commonwealth f Massachusetts. DCAMM, through its Commissioner, is a necessary party simply to help carry out the orders of this Court relating to an interim plan and obtaining an appropriate lease forthwith.

## THE RODERICK L. IRELAND COURTHOUSE

12.    The Roderick L. Ireland Courthouse ("Courthouse") is located at 50 State Street, Springfield, Massachusetts and was constructed circa 1976.

13.    The Courthouse consists of three-stories and a lower level.  The lower level is used as an underground parking area, mechanical/utility space and facilities support space. Floors one through four are utilized for court related activity, and include court rooms, temporary holding cells, department offices, and support space.

14.    The Courthouse is home to the Hampden County Superior Court; Hampden Probate and Family Court; Springfield District Court; Hampden County Registry of Deeds; Hampden County District Attorneys' Office; Hampden County Probation Office; Hampden County Law Library; Hampden County Bar Association; and Court Services Center.

15.    The Courthouse is considered one of the busiest in the Commonwealth of Massachusetts.

16.    Pre-pandemic, there was an average of 1,300-1,700 members of the public entering the Courthouse every day. In addition, there are approximately 550 employees that work throughout the Courthouse.

17.    As of 2019, there were a total of 11,933 individuals that passed through the temporary holding cells. The holding cells are found located in the basement of the Courthouse.

18.    As of 2019, the Springfield District Court (located on the first and second floor of the Courthouse) had the highest number of criminal filings and restraining orders and the third highest number of mental health filings in the Commonwealth of Massachusetts.

19.    From July through December 2019, the Hampden Probate and Family Court (located on the fourth floor of the Courthouse) had 6,455 filings.

20.    In June 2021, the Hampden County Superior Court (located on the second and third floors) had the second highest number of pending cases state-wide.

21.    Ventilation for the Courthouse is provided by four (4) central air handling units ("AHUs"), which are original to the building. The AHUs are considered "mixed air systems", delivering a portion of outdoor air and air returned from an occupied space.

22.    Conditioned supply air is delivered from each AHU to an individual thermal zone via ductwork.

23.    Chilling and heating for zones located along the interior of the building are controlled through constant air volume ("CAV") terminal boxes. Initially, the CAV boxes were electric, however, a large number were converted to hot water circa 1997 as part of an energy conservation measure.

24.   For zones located along the perimeter of the building, supplemental heating and cooling is provided by fan coil units ("FCUs"). Cooling was originally provided by chilled water and heating was provided by electric resistance coils. However, cooling and heating are now controlled through the use of a single FCU coil.

## Environmental Concerns Plague the Roderick L. Ireland Courthouse

25.  For at least the past decade, occupants of the Courthouse have issued complaints about the poor environmental conditions.

26.  A number of individuals who have worked at the Courthouse have developed serious health issues:

> a.  Judge Robert Kumor and Judge William Boyle, both First Justices of Springfield District Court, developed and died of Amyotrophic lateral sclerosis ("ALS"). Judge Kumor and Judge Boyle used the same judicial lobby. A third employee, whose office was located diagonally above Judge Kumor and Judge Boyle's lobby, also passed away from ALS.

> b.  Plaintiff Budzyna is currently in treatment for lung cancer, was previously diagnosed with bladder cancer, and has a chronic sinus infection.

> c.  Plaintiff Curtis has had trouble breathing for a long time and has been afraid to even get it diagnosed, developed bladder cancer within two years of working in the Courthouse, and has a chronic sinus infection.

> d.  At least twenty-five (25) other individuals who were long-term employees at the Courthouse passed away from cancer. Four (4) died from brain cancer and four (4) died from pancreatic cancer.

6

e. A number of long-term employees tested positive for high levels of mercury.

f. Judith Potter is the former Executive Director of the Hampden County Bar Association. She worked in the Courthouse between 1976-2006. While working at the Courthouse, Ms. Potter experienced respiratory issues and generalized body aches.  It was later found that there was mercury, lead, and arsenic present in her blood stream. She was also diagnosed with multiple sclerosis in 2006.

g. Michael Griffin, a case specialist in the Probate and Family Court for twenty-two years, suffered from numerous respiratory issues and headaches while working in the Courthouse. He is currently awaiting surgery on his vocal cords. Mr. Griffin will be required to return to work at the Courthouse in October of 2021.

h. Upon information and belief, the First Assistant Clerk of the registry of Deeds suffered severe respiratory issues.  Upon information and belief, the unsafe environmental conditions at the Courthouse contributed to the First Assistant's health issues

i. Numerous other individuals suffer from respiratory issues, headaches, irritated eyes, and other similar symptoms.

27. Upon information and belief, sometime between 2009 and 2011, Local 458 of the National Association Government Employees ("NAGE") filed a Health and Safety Grievance. The Grievance contained between 300 and 400 signatures along with a narrative of the environmental concerns in the Courthouse. The Health and Safety

Grievance reported that employees throughout the building were experiencing increased ear, nose, and throat symptoms and respiratory issues.

28. In 2015, CJAM met with various members of Hampden County to address the issues at the Courthouse and to discuss the possibility of a new courthouse.

29. During this time, legislation was passed which allowed for funds to conduct a study concerning the feasibility of a new courthouse.

30. Upon information and belief, that study was never conducted.

31. In 2017, representatives of the Courthouse formed an environmental committee to meet with CJAM and discuss possible solutions to the worsening environmental conditions at the Courthouse.  The environmental committee was formed in part due to Judge Boyle's diagnosis of ALS.

## The 2018 EH&E Survey

32. In 2018, CJAM hired Environmental Health & Engineering, Inc., ("EH&E") to conduct an assessment of the Courthouse. The assessment included administering an Occupant Survey to gather information about the indoor environmental quality ("IEQ"); attending meetings with the IEQ Taskforce (made up of representatives of the staff in the Courthouse); visually inspecting various locations in the Courthouse; and interviewing several occupants.

33. In November of 2018, EH&E administered a web-based Occupant Survey to gather information about occupant perceptions of IEQ conditions in the Courthouse and heath in relation to time spent in the Courthouse.

34. The Occupant Survey was sent to approximately 1600 current and prior occupants of the Courthouse. The return rate was approximately 34%, or 551 responses. Exhibit A.

35. Occupants of the Courthouse reported a number of frequent work-related symptoms (FWRs), including pain or stiffness in the back, neck, or shoulders; numbness in the hands or wrists; chest tightness; shortness of breath; wheezing; cough; dry or itchy skin; sneezing; sore or dry throat; sinus congestion; dizziness or lightheadedness; nausea or upset stomach; dry, itchy, irritated eyes; headaches; and tired or strained eyes.

36. Of the fifteen (15) identified FWRs, all exceeded the median prevalence of symptoms as determined by the Building Assessment Survey Evaluation ("BASE") study of 1998.[2]

37. Thirteen (13) of the identified FWRs exceeded the 75th percentile of the BASE study, and ten (10) FWRs exceeded the 95th percentile.

38. Symptoms of mucosal irritation all exceeded the 95th percentile of the study. These symptoms can be correlated with unclean work environment conditions.[3]

39. Comments and responses to open-ended questions confirmed that occupants of the Courthouse have numerous concerns about IEQs within the Courthouse. Most comments revolved around problems with air circulation, vents, ventilation, and mold.

40. More than half of the survey respondents described their work area as somewhat or very dusty/dirty.

41. 57% of respondents confirmed the presence of water-stained ceiling tiles within fifteen (15) feet of their work area.

42. 26% of respondents confirmed water-stained carpeting within the work area; 20% reported water-stained walls; and 6% reported flooding.

---

[2] The results of the BASE study were used as normative benchmark data for non-compliant buildings.

[3] Skullberg KR, Skyberk K, Kruse K, Eduard W, Djupesland P, Levy F, Kjuss H, 2004, The effect of cleaning on dust and the health of office workers: an intervention study, *Epidemiology,* 15(1):71-78.

43. According to EH&E, the presence of water-staining suggests ongoing and historical moisture control issues, water leaks, and water condensation, which often lead to mold growth.

### The 2019 EH&E Study

44. Between July and August of 2019, EH&E conducted a site assessment of 50 State Street. A copy of that assessment is attached hereto as Exhibit B.

45. During the site assessment, EH&E identified water and mold-impacted materials in various areas of the Courthouse. In some of the locations, impacted materials were wet, indicating active moisture sources. See Exhibit C – Appendix C to Site Assessment Report Detailing Visual Observations of Mold Growth and Water Damage at 50 State Street.

46. Surface sampling of the results confirmed the presence of mold growth. The mold detected is commonly seen on moisture impacted materials.

47. EH&E also identified water-stained ceiling tiles; water staining and damage near windows and perimeter areas; and dust accumulation and mold growth on supply air diffusers/surrounding tiles.

48. One of the most troubling areas was Superior Courtroom 1. Air sampling results suggested the presence of potential mold affecting the air. Results were elevated compared to those in other areas of the Courthouse.

49. As a result of the site assessment, EH&E made the following recommendations:

   a. Remove and replace water-stained ceiling tiles and monitor for reoccurrence and moisture sources;

10

b.  Remediate mold-impacted materials;

c.  Repair/repaint water-impacted materials without mold growth, and monitor for leaks;

d.  Clean supply diffusers and clean/replace surrounding ceiling tiles.

50.  EH&E also noted the presence of elevated levels of dust accumulations, including fiberglass. According to EH&E these materials commonly act as an irritant.

51.  Upon information and belief, EH&E did not measure the fiberglass strands or the amount of fiberglass strands in the air. EH&E also did not determine the type of fiberglass in the air, as the testing was not within the scope of its work.

52.  The degree of health risks associated with fiberglass depends upon the dimensions of the fiberglass; the amount of fiberglass present in the air; and the type of fiberglass found.

53.  As EH&E did not conduct testing to identify these factors, it is highly likely that the fiberglass is acting as more than just an irritant and poses a serious health risk. This is especially true when compare to the FWRs reported by occupants of the Courthouse during EH&E's 2018 Occupational Survey.

54.  EH&E also found the perimeter FCUs to be in overall poor physical condition. The interior of the FCUs confirmed moderate levels of dust buildup within the units. Internal fiberglass insulation was frayed with moderate dust loading. Surface sampling also confirmed the presence of mold growth.

55.  Pipe insulation on the chilled/hot water piping feeding the FCUs were also determined to be in poor condition, with moderate water staining on most of the units.

56.    The installation of the perimeter FCUs requires a large percentage of the return air to be drawn into units to be drawn directly from the wall cavity as opposed to occupied space.  EH&E found this condition to be "undesirable."

57.    EH&E advised that, if the FCUs were to remain in service, they were required to be thoroughly cleaned in accordance with NADCA procedures.

58.    EH&E recommended CJAM consider replacement of the units due to the poor condition of the units and the inadequate installation.

59.    During the Site Assessment, EH&E also evaluated the Courthouse's HVAC System Operation and Control.

60.    EH&E found that the modification to the HVAC system made in 1997, although advantageous for energy conservation, eliminated the possibility of reheat during the summer months. EH&E opined that this modification resulted in significant thermal comfort issues within the building. Specifically, zones that are overcooled during summer months are found to be cool and damp.

61.    Although an increase in the air temperature at the AHU will typically resolve the overcooling problem, doing so reduces the dehumidification capacity of the system, leading to increased moisture in the air.

62.    Temperatures in the Courthouse were also outside the recommended comfort range and, in some locations, exceeded the recommended dew point range.

63.    As a result, EH&E recommended "that the primary AHUs and perimeter FCUs be replaced at the Courthouse to provide substantial benefits in terms of improving overall IEQ (indoor environmental quality) conditions as well as energy efficiency and automation."

64.     During the Site Assessment, EH&E inspected the cleanliness of the supply air duct systems in the Courthouse.  This included visual inspection and the collection of samples from several supply air distribution systems.

65.     The results of the inspection indicated that most supply air distribution ducts were dirty and met the recommended criteria for cleaning as outlined by NADCA. Heavy dust and debris were observed in all test locations, with the exception of one location which was recently cleaned due to a coil replacement. Photographs taken of the FCUs highlight the amount of materials in the ducts:

 

66.     Based on the inspection results, EH&E recommended the ducts be cleaned thoroughly by a professional duct cleaning contractor in accordance with the procedures outlined by NADCA.

67.     Ventilation rates at various locations in the Courthouse were outside the recommended rate. These locations include the Jury Pool; Registry of Deeds Land Registration Department; Registry of Probate Administration Office near Room 444; and Office 204A.

68.     EH&E also recommended CJAM conduct an independent occupational health evaluation due to continued occupant concerns about IEQ.

69.     EH&E also suggested CJAM consider an epidemiological investigation based on the results of the independent occupational health evaluation.

70.    Although EH&E's report exceeded 100 pages, it was still missing a significant amount of information. For example, EH&E could not comment on whether the FCU filters (if present) were last changed, or what type of filter was in place. It also could not confirm whether the FCU cabinets had ever been cleaned.

71.    EH&E did not know the locations of the emergency fuel generator, its tank, vents, or the type of fuel was held in the tank.

72.    It was requested the EH&E provide its answer to certain questions contained on the NADCA checklist. EH&E agreed to provide the information, but upon information and belief, has yet to do so.

73.    A number of test results were also missing from EH&E's report, including test results from the top floor of the courthouse, surface sample mold results from floors G and 1, duct testing/inspection results for Floor 1, carbon monoxide testing on floor G, and allergen results for floor G. Upon information and belief, EH&E agreed to supplement its report with the missing test results and has failed to do so.

74.    EH&E also failed to attach Appendix "F" to its report, allegedly due to the size of the Appendix. Appendix "F" contains Environmental Data Resource records with respect to the environmental history of the site and history of soil contamination. Upon information and belief, EH&E agreed to supplement Appendix "F", but failed to do so.

## October 6, 2020 Tighe & Bond Site Observation

75. On October 6, 2020, Tighe & Bond conducted a second site assessment at the Courthouse.

76. Tighe & Bond inspected the AHUs and other associated heating and cooling equipment.

77. During the site assessment, Tighe & Bond found AHU-2 to be in very poor condition and recommended it be replaced. Exhibit D.

78. It also found the outside air dampers for AHU-4 were not working at the time of site visit.

79. All of the coils were dirty and in need of cleaning. Furthermore, the MERV-13 filters were dirty and starting to bend.

80. Tighe & Bond also found the Commissioner's Room, located on the second floor of the Courthouse and used for conferences and trainings, is under-ventilated.

81. As a result of the site Assessment, Tighe & Bond made a number of recommendations, including but not limited to:

    a.  Install a differential pressure sensor across filter banks for all AHUs;

    b.  Rebalance all AHUs to the recommended outside airflow rates;

    c.  Increase outdoor airflow rate beyond the recommended rate for non-peak conditions;

    d.  Rebalance all constant volume airflow boxes and air inlets and outlets;

    e.  Replace non-functioning air handling system dampers and actuators;

    f.  Clean air handler coils and drain pans

    g.  Install humidity sensors in the return air ductwork for each AHU to deal with ongoing humidity issues;

    h.  Replace AHU-2 Water Coil;

    i.  Add Prefilters to AHUs

    j.  Replace AHUs and Convert Air Distribution System to a Variable Air Volume System.

    <u>Exhibit E</u> - Tighe & Bond Section 2 Recommendations.

82. Notably, Tighe & Bond also found that the existing AHUs were approaching fifty (50) years old, and at the end of their expected useful life. The current arrangement was found

to be inefficient and contributed to the humidity and thermal comfort issues in the Courthouse, as the moisture removal capability of the AHUs is extremely limited.

83. Tighe & Bond also recommended the replacement of the FCUs, as the average life of an FCU is thirty-five (35) years, and the FCUs currently found in the Courthouse appear to be original and therefore approaching fifty (50) years.

## **Current Environmental Concerns**

84.   Despite the various issues highlighted by EH&E, as well as the recommended course of action, CJAM has taken only cursory steps to correct the environmental conditions at the Courthouse. For example, CJAM has removed the fraying fiberglass, installed vertical (as opposed to horizontal) filters; and continued to remove old insulation on pipes.

85.   CJAM has also begun to enclose the wall cavities of the FCUs. However, both the EH&E and Tighe & Bond reports recommended the units be reconfigured and/or replaced.

86.   Upon information and belief, employees at the Courthouse have received inconsistent and conflicting information about the work done on the FCUs, leading to continued concerns that the FCUs were not properly cleaned.

87.   Additionally, the conditions at the Courthouse have only deteriorated since the 2019 studies.

88.   When Court employees returned to the Courthouse after the temporary COVID-19 shutdown, some employees found clothing that had been left that building to be covered in white mold:



89.   Also during the Spring of 2020, mold became pervasive throughout the building, as more vents were opened to allow air into the building. The HVAC system could not handle the increased moisture, leading to mold on various surfaces in the courtrooms (including the American Flag and witness chairs), and in the court officers' break room:









90.   In November of 2020, Courthouse employees documented mold growth on the spines of legal books kept in the Courtrooms, water damage to ceiling tiles (which appear to show the presence of black mold), and missing ceiling tiles (with what appears to be mold present around the edge of the tile):

 



91.   In 2021, the environmental concerns at the Courthouse increased dramatically.

92.   AHU 1, located on the fourth floor, has broken down no less than three (3) times during the summer of 2021. This has left the courtrooms with no air conditioning, and has caused problems during jury trials.

93.   The drain pan for AHU 1 completely failed, which led to leaks in Courtroom 4 and the back hallway of the Probate and Family Court.







94.    Photographs taken from July 16, 2021, show that at least some FCUs continue to be plagued by dust and fraying fiberglass:



95.     Additionally, the duct work has not been cleaned, encapsulated, and/or replaced as recommended by EH&E and Tighe & Bond. This is due to the financial expense and logistical concerns associated with the project. As a result, the duct work and vents remain dirty, covered in what appears to be fiberglass and/or mold:




96.     Although CJAM applied a waterproofing sealant around the exterior windows of the Courthouse, leaks continue to persist both near and away from the windows.

 

97. The water penetration issues affect the entire Courthouse, from the temporary holding cells to the fourth floor:

 

 






98.   Mold continues to be evasive throughout the Courthouse, including in lock-up and the

Fourth Floor:











99.    The conditions of lock-up affect not only Court employees, but also private attorneys and members of the public. It is clear that such environmental conditions are causing a negative effect on the administration of justice in the Courthouse.

100.  On August 25, 2021, the continued environmental problems at the Courthouse caused Hampden County District Attorney Anthony Gulluni to evacuate his employees from the Courthouse until it was deemed safe enough to return.

101.  Shortly thereafter, Plaintiff, Cheryl Coakley-Rivera, also evacuated her employees from the Courthouse. Plaintiff, Cheryl Coakley-Rivera does not believe it will ever be safe for her employees to return to the Courthouse.

102. After D.A. Gulluni and Plaintiff, Cheryl Coakley-Rivera, held a press conference explaining the safety concerns that led to the evacuation of their employees from the Courthouse,

Defendants issued an order temporarily closing the Courthouse to conduct mold remediation and air quality testing.

103.  As part of the assessment of work to be completed at the Courthouse, CJAM requested two separate vendors to address the mold remediation. Those vendors were TRC and Serve Pro.

104.  TRC was ultimately hired by Defendants to complete the remediation work.

105.  CJAM has failed to provide copies of the reports from both vendors, including recommendations and proposals for work.

106.  The selected vendor was brought to nine (9) specific sites for testing. It is unknown which sites were selected for testing; who determined which sites were to be tested; and why only 9 sites were identified where there are more than 9 areas of obvious mold throughout the entire Courthouse.

107.  On August 27, 2021, CJAM provided an update as to the status of the Courthouse. CJAM confirmed that the Courthouse would remain closed until the test results were received and reviewed.

108.  Test results are expected **Wednesday, September 1, 2021.** As such, it is presumed the Courthouse will reopen on September 2, 2021, and employees and members of the public will be forced into an unsafe Courthouse.

109.  According to the August 27, 2021, update, US Ecology, a mold remediation firm, is using a two-step chemical remediation process. At this point, neither Defendants nor US Ecology have provided any additional information as to what is involved in the remediation process, including what chemicals are used and the affects said chemicals may have on people entering the Courthouse.

110.  The same chemical solution is also being used to clean the AHUs, which circulate air to the entire building. Given the problems with ventilation, as outlined by the EH&E report, Plaintiffs are concerned about the potential toxicity of the solution.

111.  Upon information and belief, US Ecology is not investigating any potential "behind the wall" water issues which may lead to mold growth, as they are confident the mold bloom is an air borne issue.

112.  US Ecology believes the mold growth is due to a combination of increased external air as a result of Court's response to the coronavirus pandemic and the increased humidity from Tropical Storm Henri.

113.  US Ecology's opinion completely ignores EH&E's report and recommendations concerning mold growth, which was completed in 2019, prior to the coronavirus pandemic.

114.  Moreover, the assertion that the mold growth is simply a seasonal problem is not credible when surrounding courthouses do not face the same environmental issues.

115.  Given the uncertainty and lack of transparency from the Defendant, Plaintiffs do not want to enter the Courthouse until an independent third party conducts an environmental study of the Courthouse and determines it is safe for people to reenter the building.

116.  Plaintiff, Cheryl Coakley-Rivera, and other individuals who are aware of the conditions of the Roderick L. Ireland Courthouse are fully justified in refusing to enter the Courthouse.

117.  Plaintiff, Cheryl Coakley-Rivera, on behalf of herself and all other similarly situated, should not be forced to suffer adverse health effects simply to exercise their statutory and Constitutional rights in a court of law.

118.  The environmental conditions at the Courthouse have led to a severe, adverse impact on the administration of justice.

119.  The physical and mental pain and anguish sustained by Plaintiffs and the Class includes but is not limited to the following:

      a.   fear that they could develop a health condition due to the environmental conditions at the Courthouse;

      b.   fear that they are already suffering a health condition which was caused by environmental conditions at the Courthouse;

      c.   fear and distrust that the Defendants will take the necessary steps to correct the environmental conditions at the Courthouse; and

      d.   mental anguish of realizing over and over again that they were subjected to unsafe and hazardous work conditions.

**This Court Has the Authority to Enter the Requested Relief As Described Herein.**

120.  As noted by former Chief Justice Liacos, "we [cannot] sit idly by to let our judicial employees and the citizens of the Commonwealth be endangered by the disgraceful physical conditions of our courthouses."

121.  Under Article XI of the Massachusetts Constitution,

> Every subject of the commonwealth ought to find a certain remedy, by having recourse to the laws, for all injuries or wrongs which he may receive in his person, property, or character. He ought to obtain right and justice freely, and promptly, and without denial; promptly, and without delay, comfortably to the law. Mass. Const. Ann. Pt. 1, Art. XI (2001).

122.  The Preamble to the Massachusetts Constitution further promises that:

> The end of the institution, maintenance, an administration of government is to secure the existence of the body politic; to protect it, and to furnish the individuals who compose it with the power of enjoying it in **safety** and tranquility their natural rights, and the blessings of life: and whenever these great objects are not obtained, the people have a right to alter the government, and to **take measures necessary for their safety**, prosperity and happiness. Mass. Const. Preamble.(emphasis added).

123.   In <u>Attorney General v. Sheriff of Suffolk County,</u> 394 Mass. 624 (1985), the Supreme Judicial Court held that the Judiciary may order public officials to perform duties required by statute. In that case, the Court found that a Court had the power, authority, and obligation to order a public official to construct a new jail.[4] <u>Id.</u> at 631.

124.   Similarly, in <u>County of Barnstable, et al. v. Commonwealth,</u> 422 Mass. 33, 46-47 (1996), the Supreme Judicial Court opined that:

> [I]t remains clear that proof of deficiencies in a physical plant, or essential maintenance or security staff in a particular courthouse in one of the counties, would justify our inherent power to ameliorate conditions in that facility.
> ….
>
> We can see foresee the possibility that the conditions in a particular facility may deteriorate to the point that it becomes unacceptably difficult or hazardous to continue holding court sessions in all or part of a building, thereby presenting on occasion for consideration of the application of inherent power.

125.   Justice at the Courthouse is detrimental to the health and well being of the Plaintiff and all others who use the Courthouse on a daily basis. Such situation is unconscionable. Each day that it is allowed to continue cause further irreparable harm to these individuals and to the administration of justice.

126.   A court is unlawfully denied the "full power and authority" which emanates directly from the constitution, when it is required to operate among intolerable environmental conditions which affect the health and safety of all the individuals that enter its doors.

---

[4] Other states have also found that the Judiciary has the authority to issue orders concerning the administration of justice. In <u>Carlson v. State,</u> 247 Ind. 631 (1966), the Supreme Court of Indiana found that:

> It is axiomatic that the courts must be independent and must not be subject to the whim of either the executive or legislative departments. The security of human rights and the safety of free institutions require freedom of action on the part of the court…Our sense of justice tells us that a court is not free if it is under the financial pressure, whether it be free from a city council or other legislative body, in the consideration of the rights of some individual who is affected by some autocratic or unauthorized action of such a body. One who controls the purse strings can control how tightly those purse strings are drawn, and the very existence of a dependent Justice, as well as the security of human rights and the safety of free institutions requires freedom of action of courts in hearing cases of those aggrieved by official actions, to their injury.

127.  When a court, such as the Roderick L. Ireland Courthouse, has deteriorated to the point where it no long provides Plaintiff and all other similarly situated with a safe and healthy environment, and where it has become unacceptable difficult and hazardous to continue to administer justice freely, the standard has been met for application of the inherent power of the Court.

128.  The public interest is also served by this Honorable Court ordering the remedies requested herein, as evidence by the words of the Chief Justice Margaret H. Marshall, of the Supreme Judicial Court of Massachusetts:

> Across Massachusetts, thousands of people enter our courthouses every day. They seek justice on issues that run the gamut of human experience: family disputes, criminal matters, civil rights, commercial and financial disagreements. The viability of our justice system, the strength of each individual's willingness to accept and obey our orders, depends on those who use our courts, and what they think about how we do our work. And what they think depends on the totality of what they observe and experience in our courts.

129.  It is in the public interest that the prayers for relief be granted without delay.

## CLASS ACTION ALLEGATIONS

130.  This action is brought pursuant to Federal Rule of Civil Procedure Rule 23.

131.  The Class includes all persons who are required to enter the Roderick L. Ireland Courthouse, located at 50 State Street, Springfield, Massachusetts, whether because of employment, jury duty, or legal reasons.

132.  A subset of this Class includes all persons who work, or have worked, at the Roderick L. Ireland Courthouse, who have suffered illness and/or emotional distress as a result of the indoor environmental quality concerns at the Courthouse.

133. Plaintiffs reserve the right to modify the class definition before moving for class certification, including a reservation of the right to seek to certify subclasses, if discovery or other

factors reveal that modifying the class definitions and/or seeking additional subclasses would be appropriate.

134.  Plaintiffs bring this action on their own behalf and on behalf of a Class of all others similarly situated.  The relevant time period is September 1, 2018, through the present for claims at issue in this action.

135.  The Class is composed of at least 550 people, the joinder of whom is impracticable, if not completely impossible, except by means of a class action.  The disposition of their claims in a class action will benefit the parties and the Court.

136.  There is a well-defined community of interest in the questions of law and fact involving and affecting the parties to be represented.  Common questions of law and fact exist and such common questions predominate over any questions of law or fact which may affect only individual Class members.

137.  Plaintiffs assert claims that are typical of the claims of the entire Class.

138.  Plaintiffs and their attorneys will fairly and adequately represent and protect the interest of the Class.  Plaintiffs have no interests antagonistic of those of the Class.  Plaintiffs have retained counsel who are competent and experienced in class action litigation.

139.  Defendants have acted or refused to act on grounds generally applicable to all members of the Class, thereby making final relief concerning the Class as a whole appropriate.

140.  Plaintiffs and the Class have suffered injury and damages as a result of Defendants' wrongful conduct as alleged herein. Absent a class action, the Class will continue to suffer injury, thereby allowing these alleged violations of law to proceed without remedy, and allowing Defendants to retain the proceeds of their ill-gotten gains.

141. Plaintiffs anticipate that there will be no difficulty in the management of this litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I – DECLARATORY JUDGMENT

142. Plaintiffs reassert and incorporate herein each and every allegation in the preceding paragraphs of this Complaint as if set forth fully herein.

143. As set forth, above, an actual controversy exists between the Parties sufficient to bring this case within G.L. c. 231A.

144. The Declaratory Judgment Act, G.L. c. 231A, "is declared to be remedial. Its purpose is to remove, and to afford relief from, uncertainty and insecurity with respect to rights, duties, status and other legal relations, and it is to be liberally construed and administered.

145. As the foregoing allegations of this Complaint demonstrate, the Plaintiffs have suffered harm and are prejudiced in their abilities to fulfill their duties by reason of uncertainty surrounding their rights, including, but not limited to, the right to work in a safe building, free from environmental hazards such as mold and fiberglass.

146. Plaintiffs also have a right to timely and complete information regarding: (a) ongoing work at the Roderick L. Ireland Courthouse; (b) air quality and mold test results for the entire Courthouse; (c) recommendations and scope of work proposals for vendors other than those hired by Defendants.

147. There is no basis in law or in equity for the assertion of unreviewable, unaccountable authority in the Office of CJAM to unilaterally schedule and conduct work in the Courthouse concerning the current environmental problems at the Courthouse without affording Plaintiffs a

prior opportunity to review and comment on the plans and to seek effective relief from appropriate agencies and courts before their rights and the rights of others have been violated or compromised.

148.  Plaintiffs and the Class have demonstrated a reasonable likelihood of success on the merits.

149.  If Plaintiffs and the Class are not granted injunctive relief, then Plaintiff and the Class will suffer irreparable harm.

## COUNT II – VIOLATION OF 42 USC §1983

150.  Plaintiffs reassert and incorporate herein each and every allegation in the preceding paragraphs of this Complaint as if set forth fully herein.

151.  The Due Process Clause of the Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property without due process of law."

152.  Defendants acts and omissions were made under the color of state law.

153.  Defendants violated the rights of Plaintiffs and all other similarly situated, by failing to protect them from harm and provide them with a safe working environment.

154.  The Defendants' actions and omissions were done with deliberate indifference, and constituted deliberate disregard for the health, safety, and rights of the Plaintiffs and others similarly situated.

155.  The Defendants' acts and omissions shock the conscience.

156.  Plaintiffs and the Class have demonstrated a reasonable likelihood of success on the merits.

157.  If Plaintiffs and the Class are not granted injunctive relief, then Plaintiff and the Class will suffer irreparable harm.

158.  Pursuant to 42 USC §1983, the Plaintiffs and the Class seek recovery to the greatest extent available under the law.

## CLAIMS FOR RELIEF

Wherefore, Plaintiffs and the Class respectfully request that the Court:

A. Issue a Short Order of Notice enter on this date ordering all defendants to appear and show cause why the relief requested herein should not be granted as a permanent injunction;

B. Enter a temporary restraining order that the Roderick L. Ireland Courthouse be immediately closed and employees ordered to vacate the inadequate, unsafe, and life-threatening facilities which are causing or have the potential to cause severe adverse health effects.

C. Enter a temporary restraining order preventing Defendants from ordering employees and members of the public to enter the Roderick L. Ireland Courthouse until an independent environmental study can be completed to determine the safety of the Courthouse;

D. Order an infrared/thermal inspection be completed of the entire Courthouse to determine whether moisture is actually present behind the walls;

E. Order Defendants to conduct Occupational Health Evaluations as discussed in the EH&E Report;

F. Order Defendants to conduct an epidemiological study of the Courthouse;

G. Order Defendants to replace the AHUs and FCUs, as outlined in both the EH&E and Tighe & Bond Reports;

33

H.  Order Defendants to present to this Court an interim plan so that the citizens of Hampden County may be provided access to a District Court, Superior Court, Registry of Deeds, and Family and Probate Court, during an interim period while an appropriate leased or purchased space is identified;

I.  Order Defendants, on an expedited and emergency basis, to find a temporary, reasonable alternative location for the administration of justice until it has been determined by an independent study that it is safe for people to reenter the Courthouse;

J.  Order Defendants to produce any and all documents related to the various studies completed at the Courthouse;

K.  Appoint a Special Master, such as Retired Justice Greaney or Retired Justice Spina, to oversee this litigation;

L.  If the Court finds that this lawsuit invokes the superintendence powers reserved solely for the Supreme Judicial Court under G.L. c. 211, §3, it is respectfully requested this Court provide a factual record for the Court before the case is transferred to the Supreme Judicial Court on an emergency bases for any action necessitated by that Court.

M.  Certify this action as a class action pursuant to Federal Rule of Civil Procedure 23 and designate Plaintiffs as the representatives of the Class;

N.  Determine the damages sustained by Plaintiffs and the Class as a result of Defendants' violations of 42 USC §1983, and award any actual or compensatory damages proved;

O.  Award Plaintiffs and the Class punitive damages as a result of Defendant's negligent and reckless conduct;

P.  Award Plaintiffs and the Class their costs and disbursements of this suit, including, without limitation, reasonable attorneys' fees, expenses and costs;

Q.  Award Plaintiffs and the Class pre-judgment and post-judgment interest as provided by law; and

R.  Grant Plaintiffs and the Class such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiffs, on behalf of themselves and all others similarly situated, hereby demand a trial by jury on all issues so triable.

Dated: September 8, 2021               Plaintiffs
By Their Attorneys,

                              **/s/ Laura Mangini**
Laura D. Mangini, Esquire (BBO#684620)
Robert A. DiTusa, Esquire (BBO#649218)
Ryan E. Alekman, Esquire (BBO #636916)
Alekman DiTusa, LLC
1550 Main Street, Suite 401
Springfield, Massachusetts, 01103
Tel:    (413) 781-0000
Fax:   (413) 827-0266
laura@alekmanditusa.com
robert@alekmanditusa.com
ryan@alekmanditusa.com

    **/s/ Jeffrey S. Morneau**

Jeffrey S. Morneau, Esquire (BBO #643668)
Chelsea Choi, Esquire (BBO #697440)
CONNOR, MORNEAU & OLIN, LLP
273 State Street, Second Floor
Springfield, Massachusetts 01103
Tel:    (413) 455-1730
Fax:    (413) 455-1594
jmorneau@cmolawyers.com
cchoi@cmolawyers.com


    **/s/ Thomas A. Kenefick, III**

Thomas A. Kenefick, III, Esquire (BBO #267620)
73 Chestnut Street
Springfield, Massachusetts 01103
Tel:    (413) 734-7000
Fax:    (413) 731-1321
takenefick@takenefick.com

## VERIFICATION OF COMPLAINT

I, Richard Budzyna, hereby certify that I have read each and every allegation of the Complaint set forth hereinabove and I believe such allegations to be true based upon information and belief.

Signed under the pains and penalties of perjury this 8th day of September, 2021.

**/s/ Richard Budzyna**_____
Richard Budzyna

## <u>VERIFICATION OF COMPLAINT</u>

I, William Curtis, hereby certify that I have read each and every allegation of the Complaint set forth hereinabove and I believe such allegations to be true based upon information and belief.

Signed under the pains and penalties of perjury this 8th day of September, 2021.

**/s/ William Curtis**
William Curtis